IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WOODLAND INVESTOR MEMBER, L.L.C.,

        Plaintiff,

        vs.                    Case No. 11-2013-JTM

SOLDIER CREEK, L.L.C., ET AL.,

        Defendants.

MEMORANDUM AND ORDER

Before the court is Woodland Investor Member L.L.C.'s (WIM) Motion for Summary Judgment (Dkt. No. 51). WIM and defendants entered into an Operating Agreement for the purpose of building an apartment complex in Topeka, Kansas. With the apartments nearing completion, defendants failed to meet the necessary requirements to receive funding from WIM, and the apartments were never finished. In this motion, WIM seeks summary judgment on its claims against defendants for breach of the Operating Agreement and breach of the Guaranty Agreement. It also seeks summary judgment on the defendants' four Counterclaims. The uncontroverted facts establish that WIM performed its obligations under the Operating Agreement and that defendants are liable for breach of contract and for breach of the Guaranty Agreement. The facts also show that WIM is not liable to defendants for any of the Counterclaims. Therefore, the court grants WIM's motion.

## I. Uncontroverted Facts

### A. The Parties

WIM is a Delaware limited liability company, whose sole managing member, NEF Community Investments, Inc., is an Illinois not-for-profit corporation with its principal place of business in Chicago, Illinois. WIM's predecessors in interest include NEF Assignment Corporation (NEFAC) and National Affordable Housing Fund I, L.P. (NAHF). Under the Operating Agreement, the Investor Member (WIM and its predecessors in interest) may voluntarily transfer its membership interest at any time as long as certain conditions are met. *See* § 9.1. In addition to the conditions in § 9.1, the assignment does not become effective "unless and until [Soldier Creek] consents in writing to such substitution, which consent may not be unreasonably withheld; provided that no such consent shall be required for the substitution of an Assignee that is an Affiliate of the Investor Member." Dkt. No. 52, Ex. B., § 9.2. On November 9, 2007, NEFAC entered into an Assignment and Assumption Agreement with NAHF, under which NEFAC transferred its right, title, and interest in Woodland Park to NAHF. Under the terms of the Assignment, NEFAC agreed to "transfer[], assign[] and convey to [NAHF] all of [NEFAC's] right, title and interest in and to its Interest in the Project and [NEFAC's] rights and obligations under the Related Documents. The Interest constitutes all of [NEFAC's] interest in [the Woodland Park Project]." Dkt. No. 52, Ex. A-2, ¶ 2 (alterations added). Further, NAHF accepted the assignment and agreed to be bound "to the same extent as [NEFAC], by the provisions of the Operating Agreement, the Related Documents and any other documents required in connection therewith and to assume the obligations of [NEFAC] thereunder." *Id.* ¶ 4 (alterations added). On December 30, 2010, NAHF entered into an Assignment and Assumption of Investor Member Interest with WIM, under which NAHF transferred its right, title,

2

and interest in the Woodland Park Project to WIM. NAHF's general partner is NEF Community

Investments, Inc., who is also the sole managing member of WIM. WIM is an Affiliate of NAHF,

as defined in the Operating Agreement.[1]

Defendant Soldier Creek, L.L.C., is a limited liability company organized under Kansas law

with its principal place of business in Topeka, Kansas. Its members are the individual defendants

George M. Hersh, II, John M. Hersh, and Brian C. Hersh. The individual defendants are all citizens

and residents of Kansas. Defendant Hersh Development Company, L.L.C., is a Kansas limited

liability company whose sole members are the individual defendants.


*B. The Operating Agreement*

The Operating Agreement central to this dispute between the parties became effective on

May 1, 2007. The Operating Agreement governed the relationship of Soldier Creek and NEFAC,

with respect to construction and financing of the Woodland Park at Soldier Creek Apartments

Project (Woodland Park Project). Soldier Creek was the "Managing Member" of the Woodland Park

Project, and NEFAC, as nominee, was the "Investor Member." All defendants had independent legal

counsel during the negotiation and drafting of the Operating Agreement. And defense counsel

affirmatively represented to NEFAC that they had "reviewed the . . . Operating Agreement [and]

Guaranty Agreement," and that it "constitutes the valid, legal, and binding agreement of [Soldier

Creek] and members thereof, enforceable in accordance with its terms." Dkt. No. 52, Ex. D, pgs. 1-2

(alterations added). Section 6.3(dd) of the Operating Agreement provides that "[t]his Operating

Agreement is binding upon and enforceable against [Soldier Creek] in accordance with its terms."

---

[1]Throughout this Memorandum and Order the court will refer to WIM, NEF, NEFAC, and NAHF interchangeably.

Dkt. No. 52, Ex. B, § 6.3(dd) (alterations added).

The Woodland Park Project's stated purpose under the Operating Agreement was "(a) to acquire, construct, own, finance, lease, and operate the Project Property as a qualified low income housing project within the meaning of § 42 of the [Internal Revenue] Code; (b) to eventually sell or otherwise dispose of the Property Project in a manner consistent with the provisions of this Operating Agreement; and (c) to engage in all other activities incidental or related thereto." *Id.* § 2.2 (alterations added). Section 42 provides a tax credit for investment in certain low-income housing buildings. It was clear to all parties that the only way NEFAC or its related entities would obtain a return on investment was to obtain these tax credits. Further, § 6.4(l) provided:

> [Soldier Creek] acknowledges that it is of great importance that the federal Tax Credit under § 42 of the Code and all other tax benefits contemplated in the Projections be achieved and maintained. Accordingly, [Soldier Creek] agrees as follows:
>> (I) No Delays. [Soldier Creek] shall not cause or suffer any delay in Placement in Service or Qualified Occupancy that would reduce such anticipated tax benefits.

*Id.* § 6.4(l) (alterations added).

NEFAC's obligations to fund the Project, defined in § 3.2 of the Operating Agreement, required it to provide capital contributions of $7,057,000, payable in separate installments. Each installment was due only after specified conditions related to completion of the Woodland Park Project had been met by Soldier Creek. The capital contributions were divided into two types: (1) Non-Developer Fee Equity, and (2) Developer Fee Equity. Under Non-Developer Fee Equity, NEFAC was required to provide capital in five installments: $2,509,140, less $35,000; $1,792,243; $597,414; $466,830; and $608,516. The first, second, and third installments totaling $4,863,797, were paid in accordance with the Operating Agreement. Under Developer Fee Equity, NEFAC was

4

required to provide capital in three installments: $433,143; $541,429; and $108,286. NEFAC funded

the first Developer Fee installment. Section 3.8 provides that "[e]xcept as expressly provided in this

Operating Agreement, no Member is required to make additional contributions to the capital of [the

Woodland Park Project]." Dkt. No. 52, Ex. B. § 3.8.

Section 12.9 provides "[t]his Operating Agreement contains the entire agreement among the

Members with respect to the transactions contemplated herein, and supercedes all prior or written

agreements, commitments, or understandings with respect to the matters provided for herein and

therein." *Id.* § 12.9. Section 12.11 provides that "[e]xcept as otherwise provided for herein, this

Operating Agreement may not be amended in whole or in part except by a written instrument signed

by [Soldier Creek] and [WIM]." The Operating Agreement must be interpreted consistently with the

laws of Kansas.

### C. The Fourth Installment

As noted above, NEFAC was required to pay a fourth Non-Developer Fee Equity installment

of $466,830, upon Soldier Creek's satisfaction of 11 specific conditions, which included, in part:

> (B) Receipt by [NEF] of an architect's certification indicating that all the work has
> been substantially completed in accordance with the plans and specifications
> provided to, and approved by [NEF];
> (C) Receipt of final lien waivers from the general contractor and all subcontractors
> (or evidence that such final waivers are pending conditioned only upon payment of
> this Installment);
> (I) Satisfactory completion of 100% of the construction of the Project as evidenced
> by the construction disbursement documents and approved by [NEF's] construction
> inspector.

Dkt. No. 52, Ex. B. § 3.2(a)(iv)(B)-(C), (I). On January 30, 2009, JRMA Architects, Inc., issued nine

Certificates of Substantial Completion for nine buildings indicating that the work on those buildings

was "substantially complete." Dkt. No. 56, Ex. 2. But the Certificates "exclude[d] all Punch List items which are outstanding as of the date of this certificate." *Id.* And the architect testified at the Arbitration that the Certificates certified substantial completion of the interiors of each building but not the entire project. Soldier Creek has not produced a certificate of substantial completion for the entire Woodland Park Project.

On February 11, 2009, Neighbors Construction, the general contractor,  issued a "Waiver and Release of Lien" stating that it waived and released all bonds, liens, or claims against the Woodland Park Project on the condition that it received $626,801.86 (draws 20 and 21). Satisfactory completion of 100% of the project as evidenced by the construction disbursement documents and approved by NEF's construction inspector has not occurred.

Section 3.2(c) attaches additional express funding conditions:

> The obligation to pay the amounts due under § 3.2(a) and (b) is expressly conditioned upon each of the following requirements, in addition to those requirements that are set forth above, being satisfied at all times prior to and including the due dates of the above payments:
>> (I) [Soldier Creek] has fully complied with all of its covenants and obligations set forth in this Operating Agreement (including, without limitation, those covenants and obligations set forth in § 6.3);
>> (ii) The representations and warranties of [Soldier Creek] set forth in the Operating Agreement are true and correct as of the date of funding of the Capital Contribution payment (including, without limitation, those set forth in § 6.3); [and]
>> (iv) There has been no, and there is no imminent nor threatened, material adverse change in [Soldier Creek's] financial or business condition to operations that affects its ability to perform its obligations hereunder.

Dkt. No. 52, Ex. B., § 3.2(c). One of Solider Creek's obligations under § 6.3 was that "[t]he construction of the Project Property will be completed in a timely and workmanlike manner by [February 1, 2009] and in compliance with: (1) applicable requirements of the Construction Loan or Permanent Loan; (2) the Plans and Specifications; (3) the Projections . . ." § 6.3(v) (alterations

added).

Under § 6.4(f)(I), Soldier Creek was required to provide a "Development Completion Guaranty":

> [Soldier Creek] hereby absolutely and unconditionally guaranties to [the Woodland Park Project] and [NEFAC] that the Project Property will be constructed in a good and workmanlike manner free and clear of all mechanics' and similar liens, in accordance with the Plans and Specifications and in accordance with the terms, conditions and provisions of the Construction Loan, Permanent Loan, and this Agreement, will be equipped with all necessary and appropriate fixtures, equipment and personal property on or before the Construction Completion Date, and the Project will be leased-up in accordance with the Projections. The obligations of [Soldier Creek] under the foregoing sentence shall include, without limitation, providing all funds (subject to the limitations set forth below) required of the Company to complete construction of the Project Property or to repair latent defects that occur within one year of completion of construction (to the extent not then available under the Construction Loan, Permanent Loan, or Capital Contributions), and pay all funds needed for unanticipated or additional development or construction costs, on and off-site escrows, taxes, insurance premiums, interest, funding of Operating Deficits, reserves, escrows, legal expenses, and accounting expenses until the Project achieves Breakeven Operations.

§ 6.4(f)(I) (alterations added). The Woodland Park Project has not been completed as of the date of this Memorandum and Order. Carports need to be built, a punch list of other work needs to be completed, and other corrective work remains unfinished.

Despite not meeting the conditions, Soldier Creek began requesting a partial release of the Fourth Installment in late January and early February 2009. Without a partial release, Hersh Development realized it would be unable to pay the entire 20th draw to Neighbors Construction.

There is no written agreement executed by the parties obligating NEFAC to fund the Fourth Installment prior to satisfaction of the conditions set forth in the Operating Agreement. In an internal NEF email, Mr. Boelter, an Associate Asset Manager for NEF, requested authority to defer the 100% completion, the lien waiver, and the ALTA "as built" survey; he did not request a waiver of

such conditions. He also stated that the Woodland Park Project would be at least $357,621 over budget. On February 18, NEF's Asset Management Department indicated that it was okay with a partial payment of $200,000, with the balance of $266,830 to be paid when the final construction completion, final lien waivers, and final ALTA survey were submitted. On April 16, Mr. Boelter informed Mr. Feaster, an employee at Hersh Development from January 2006 to July 2010, that NEF needed the final lien waivers, the ALTA survey, and a letter from the architect verifying that the work was substantially completed before releasing the partial payment. By May 26, the issues were unresolved and Mr. Boelter again informed Mr. Feaster that NEF could not release a partial payment on the Fourth Installment because there were outstanding liens on the Project.

One month later, Ms. Eaton, NEF's Vice President of Asset Stabilization and Credit, told Mr. Feaster:

> We did have a discussion with the Investor and it looks like we will be able to provide some assistance by funding the 100% completion equity payment and purchasing the upward adjuster. This has to be run through the higher ups at the investor and I may not have a firm answer until after the holiday but I will continue to pursue as promised.

Dkt. No. 56, Ex. 10. On July 21, Ms. Eaton sent Mr. Feaster and George Hersh an email stating that NEF "would release the $466,000 into escrow. Please send wiring instructions as soon as possible." Dkt. No. 56, Ex. 11.

By August 18, NEF had not released the Fourth Installment. A week later, Ms. Eaton sent Michael Slade at Wells Fargo Bank a letter providing:

> As per our agreement with Woodland Park at Soldier Creek LLC, National Equity Fund, Inc. as asset manager for NEF Affordable Housing Corp. LP the investor member in the above referenced limited liability company has agreed to the release of the 4th equity installment of $466,830 prior to the required benchmarks outlined in the Operating Agreement being met. As a condition to that early release the following instructions are being directed to the Trustee:

8

1. Instructions to be sent to Trustee via e-mail by NEF, Rose H. Eaton
2. Funds to be received by Wells Fargo Bank, N.A., Trustee, and placed into the construction funding account; and
3. Funds shall be released upon receipt of confirmation from the Title company that all outstanding subcontractor liens have been released; and
4. NEF's approval to release of the funds.

Dkt. No. 56, Ex. 19. Defendants never received the Fourth Installment.[2] Even if the Fourth Installment had been released, Mr. Feaster estimated that it would still be "about $1,000,000 short of solving our problem." Dkt. No. 52, Ex. F. Soldier Creek was unable to obtain other non-NEF financing from July to August 2009.

### D. Leasing the Apartment Units

Section 7.2 prohibits WIM from doing certain things: "Except as otherwise expressly provided in this Operating Agreement, the Investor Member shall not participate in the operation, management, or control of [the Woodland Park Project's] business, transact any business in [] name, or have any power to sign documents for or otherwise bind [the Woodland Park Project]." Neither WIM, nor its successors in interest, signed any documents on behalf of the Woodland Park Project.

The management company for the Woodland Park Project was America First Properties

---

[2]Defendants have also produced an unsigned letter from Ms. Eaton to Ken Dotson at Wells Fargo Bank stating:

As per agreement with Woodland Park at Soldier Creek LLC, National Equity Fund, Inc. an asset manager for NEF Affordable Housing Corp, LP the investor member in the above referenced limited liability company has agreed to the release of the 4th equity installment of $466,830 prior to the required benchmarks outlined in the Operating Agreement being met. As a condition to that early release the following instructions are being directed to the Trustee:
1. Instructions to be sent to Trustee via e-mail by NEF, Rose H. Eaton
2. Funds to be received by Wells Fargo Bank, N.A., Trustee, and placed into the construction funding account; and
3. Funds shall be released upon receipt of confirmation from the Title company that all outstanding subcontractor liens have been released; and
4. NEF's [sic] will approval to release of the funds.

Dkt. No. 56, Ex. 17.

Management. George M. Hersh, II testified that Ms. Eaton and Mr. Boelter instructed the management company's staff to (1) process claims faster, (2) set up a model apartment, (3) put on a barbeque, (4) have a promotion to give away a free TV, and (5) have a promotion to give away free rent for a year to a new tenant. Mr. Hersh also testified that the purpose of those instructions was to get the Woodland Park Project leased-up in accordance with the Projections. None of the instructions caused the management company employees to perform their jobs incorrectly, and none of the instructions caused Soldier Creek to breach any agreements it had with a third party.

Sales, Inc., is a specialized leasing company that helps developments lease-up available units on a fast track, and was brought in to help with the Woodland Park Project because it was not getting leased-up in accordance with the Projections in the Operating Agreement. WIM never told Soldier Creek that it would quit funding the Woodland Park Project if Soldier Creek did not hire Sales, Inc. Soldier Creek hired Sales, Inc., to help lease-up the project. It did not breach any agreement it had with third parties in doing so.

The Projections in Appendix I specify the rents to be charged for each apartment, and the Operating Agreement requires Soldier Creek to "achieve Qualified Occupancy within the time specified in the Projections, and [] comply with the rent schedule set forth therein." Dkt. No. 52, Ex. B. § 6.4(k) (alterations added). WIM suggested Soldier Creek reduce rents because the apartments were not being leased-up in accordance with the requirements in the Operating Agreement. Soldier Creek reduced rents, and that reduction did not cause it to breach any other agreements it had. WIM also suggested to Soldier Creek that it lower rents on the two-bedroom apartments. WIM told Soldier Creek to implement a commission for the leasing staff and that it needed "weekly lease-up reports on number of walk-ins, applications received, # of pending applications, # of units leased,

etc. starting this Friday." Dkt. No. 56, Ex. 161.

In response to an Interrogatory requesting defendants to identify their damages, no damages were linked to the alleged improper participation allegations.

Section 6.2 of the Operating Agreement contains a list of 26 actions that Soldier Creek "does not have the authority to take . . . without the prior written consent of the WIM" including, in part:

> (a) Do any act in contravention of or inconsistent with this Operating Agreement or any other agreement to which the Company is a party (including, without limitation, those relating to the Construction Loan and Permanent Loan);
> (r) Hire or retain any Person to manage the Project Property or the Company's business other than America First Properties Management. The management agreement with America First Properties Management, as the Project Property manager will contain the provisions specified in this Agreement, including those specified under "Management Agent" in the Article I hereof;
> (s) Take any action (or fail to take any action) causing or resulting in a breach of any of the representations, warranties or covenants of [Soldier Creek] set forth in this Operating Agreement, including, without limitation, those set forth in § 6.3;

§ 6.2(a), (r)-(s).

George M. Hersh, II testified that in his experience he expected that if there were deficiencies in the work, or items left uncompleted on a development project, the general contractor had to complete them before receiving final payment. Even absent an instruction by WIM requiring the general contractor to fix deficiencies, Soldier Creek would have required Neighbors Construction to do so.

*E. Soldier Creek's Repurchase Obligation*

Section 6.9 of the Operating Agreement provides:

(e) **Repurchase.** Notwithstanding anything contained herein to the contrary, in the event that . . . (2) Breakeven Operations does not occur within 12 months of the

Construction Completion Date, unless [Soldier Creek] provides all funds required, over and above the funds available in the Lease-up Expense Line Item, for all Operating Deficits until Breakeven Operations Occurs [or] (3) proceedings have been commenced, filed or initiated to foreclose on the Construction Loan or Permanent Loan mortgage or permanently enjoin construction or rehabilitation of the Project . . . [Soldier Creek] shall purchase [NEFAC's] interest in [the Woodland Park Project] for an amount equal to the sum of all Capital Contributions actually made to [the Woodland Park Project] by [NEFAC] plus $50,000 plus all expenses incurred by [NEFAC] in connection with entering into [the Woodland Park Project]. Upon receipt of this amount, [NEFAC's] interest as a investor member in [the Woodland Park Project] will terminate, [NEFAC] shall transfer its interest in [the Woodland Park Project] to [Soldier Creek] or its designee(s), and [Soldier Creek] shall indemnify and hold harmless [NEFAC] from and against all losses, damages, and liabilities to which [NEFAC] (as a result of its participation hereunder) may be subject.

Dkt. No. 52, Ex. B. § 6.9(e) (alterations added). "Breakeven Operations" means:

the date upon which (I) at least 95% of the Project's rental Units have been occupied by tenants actually paying rents at monthly rates at least equal to those assumed in the Projections for a period of three consecutive months and (ii) the revenues from the normal operation of the Project received on a cash basis (including all public subsidy payments due and payable at such time but not yet received by [the Woodland Park Project] for a period of three (3) consecutive months after Construction Completion, equal or exceed all accrued operational costs of the Project (including, but not limited to, taxes, assessments, replacement reserve deposits) and debt service payments, and a ratable portion of the annual amount (as reasonably estimated by the Managing Member) of seasonal and/or periodic expenses (such as utilities, maintenance expenses and real estate taxes) which might reasonably be expected to be incurred on an unequal basis during a full annual period of operations, for such a period of three (3) consecutive calendar months on an annualized basis, as evidenced by a certification of [Soldier Creek] (with an accompanying unaudited balance sheet of [the Woodland Park Project]) certifying that all trade payables have been satisfied or will be satisfied by cash held by [the Woodland Park Project] on the date of such certification.

*Id.* pgs 2-3 (alterations added). One or more of the preconditions to Soldier Creek's obligation to "purchase the Investor Member's interest" in Woodland Park occurred on or before July 23, 2010. The "Construction Completion Date" was February 1, 2009. Breakeven Operations did not occur within 12 months of that date. On June 7, 2010, Wells Fargo Bank, N.A., commenced proceedings

12

in the Shawnee County, Kansas District Court to foreclose on the construction loan.

*F. The Guaranty Agreement*

The Guaranty Agreement at issue in this case provides that it "is made as of the date set forth on the signature page hereof, by the undersigneds (collectively, the 'Guarantor'), for the benefit of the limited liability company identified on such signature page (the 'Company'), of which the Managing Member identified on such signature page (the 'Managing Member') and [NEFAC], an Illinois not-for-profit corporation (the 'Investor Member'), are parties." Dkt. No. 52, Ex. A-1, pg. 1 (alterations added). On the signature page, the "Company" is identified as the Woodland Park Project, the "Managing Member" is identified as Soldier Creek, and the "Guarantors" are identified as Hersh Development, George M. Hersh, II, Brian C. Hersh, and John M. Hersh. The Operating Agreement also refers to the "Guarantors," and defines that term as "collectively and individually . . . Hersh Development Co., L.L.C.[,] George M. Hersh, II, Brian C. Hersh and John M. Hersh." Dkt. No. 52, Ex. B, pg. 5. The Operating Agreement also refers to the Guaranty as "the Guaranty Agreement between [the Woodland Park Project] and the Guarantors dated as of the date hereof whereby the Guarantors guaranty the obligations of [Soldier Creek] under the Operating Agreement including, but not limited to [Soldier Creek's] guaranty obligations under § 6.4(f) and [Soldier Creek's] payment obligations under § 6.9." *Id.* pg. 5 (alterations added).

Paragraph one of the Guaranty Agreement provides that "[Soldier Creek] will fully and faithfully perform all its obligations under the Operating Agreement, including without limitation its Company management duties, its development completion . . . guaranties and its guaranties with respect to payment for reduced and delayed tax credits (collectively, the 'Managing Member

13

Obligations'), pursuant to, without limitation, § 6.4(f) and § 6.9 of the Operating Agreement." *Id*

at pg. 2 (alterations added). It also provides for a guaranty of Soldier Creek's obligations,

enforcement of the agreement itself, reimbursement of expenses, an absolute guaranty, and joint and

several liability among the multiple guarantors.[3]

The Guaranty Agreement is governed by Kansas law.


*G. Construction Contingency*

There is no provision in the Operating Agreement requiring WIM to fund a construction

---

[3]The Guaranty Agreement provides, in part:

**2. <u>Guaranty Funding</u>**. If [Soldier Creek] fails to perform any of the Managing Member Obligations, the Guarantor will from time to time deposit with [the Woodland Park Project] such funds as are necessary to ensure full compliance therewith, including any compensation due to [NEFAC] under the Operating Agreement for damages resulting from noncompliance. By executing and delivering this Guaranty, the Guarantor acknowledges and agrees to comply with the terms and conditions of the Operating Agreement, to the extent applicable to it, and to be bound by the provisions thereof.

**4. <u>Enforcement and Guaranty</u>**. Guarantor shall pay on demand by [the Woodland Park Project] any and all expenses (including without limitation attorneys' fees) incurred by [the Woodland Park Project] in the enforcement of this Guaranty and the preparation therefor, whether or not an action or proceeding to enforce the same shall have been instituted. In any right of action that may accrue to [the Woodland Park Project] by reason of any obligations guaranteed hereunder, [the Woodland Park Project] may, at its option, proceed against (a) the Guarantor, together with [Soldier Creek] . . . . If there is more than one Guarantor or Managing Member, each of the foregoing remedies may be applied to any or all of them. Prior to filing any action against the Guarantor to enforce the guaranty made hereunder, [the Woodland Park Project] or [NEFAC], as applicable, shall first give [Soldier Creek] and the Guarantor a reasonable period of notice with an opportunity to cure any failure to perform as required hereunder, which shall be at least ten (10) days except in case of an emergency.

**9. <u>Absolute Guaranty</u>**. This Guaranty is an absolute, irrevocable, present, and continuing one, and the Managing Member Obligations shall be conclusively presumed to have been created in reliance hereon.

**12. <u>Investor Member Enforcement</u>**. In the event [Soldier Creek] fails to perform any of the Managing Member Obligations and [the Woodland Park Project] fails to enforce diligently the Guarantor's obligations under this Guaranty, [NEFAC] shall, after giving [Soldier Creek] and the Guarantor reasonable notice and an opportunity to cure such failure as required under Paragraph 4 hereof, have all rights and remedies available to [the Woodland Park Project] hereunder or at law or in equity to enforce the Guarantor's guaranty obligations hereunder and to recover any and all damages for Guarantor's breach thereof.

**16. <u>Multiple Parties</u>**. If there is more than one Guarantor, each of them has executed and delivered this Guaranty; references herein to "Guarantor" shall mean all such Guarantors, collectively, and their obligations hereunder shall be joint and several. . . .

Dkt. No. 52, Ex. A-1, pgs. 2-5 (alterations added).

contingency budget. But Financial Projections were attached to the Operating Agreement as Appendix I. In those Projections there is a separate line item for a "Construction Contingency" of 4.6%, or $755,486.

On May 17, 2007, Hersh Development and the individual defendants signed a "Commitment Letter" with NEFAC. This letter "describe[d] the basic terms and conditions upon which NEF would be willing to make the Project investment." Dkt. No. 56, Ex. 6, pg. 1. The letter also stated that:

> Generally, the terms described in this Commitment Letter and Operating Agreement should be considered in the aggregate to constitute the whole of our agreement. In the event the terms and conditions described in this Commitment Letter differs from the terms and conditions that are eventually set forth in the Operating Agreement, the terms and conditions of the Operating Agreement will control when it is approved and executed by NEFAC.

*Id.* Like the Operating Agreement, the Commitment Letter contains a "Construction Contingency" of 4.6%, or $755,486. A contingency budget is important and necessary for a construction project because it can cover the usual budget overruns incurred during construction. The parties dispute many aspects of the Construction Contingency. Neither the Operating Agreement nor the Commitment Letter provide that NEF may alter the Construction Contingency budget. And both are silent as to how and who would fund the Construction Contingency. Mr. Feaster testified that Hersh Development expected NEF to fully fund the Construction Contingency budget.

Sometime in late 2008, or early 2009, the parties had several communications about the Construction Contingency. On May 15, 2009, Mr. Feaster sent an email to Mr. Boelter and Ms. Eaton. In pertinent part the email stated:

> In our original budget, we had $430,846 as a contingency item which is approximately 2.5%. . . . We were aware, through discussions with Scott, that NEF wanted a 5% contingency, the position was taken that the additional 2.5% would be "netted" from the construction costs and shown as additional contingency and we were fine with that. However, it appears that in the final numbers that were going

15

back and forth prior to closing, our $430,846 was dropped completely and the entire 5% was netted from the construction costs.

Dkt. No. 56, Ex. 8. Scott Fitzpatrick, Asset Manager for NEF, responded:

Prior to going to investment committee we discussed that the contingency would need to be increased by $325,000. At that time the construction cost line item was not changed.

After investment committee approval there was a question as to if our operating reserve requirement would also satisfy the operating/debt service reserve requirements of the lender. At that time we discussed the impact on the projections (an increase to the operating reserve of $300,000) and you indicated that you had an extra cushion in the construction number and to reduce it by that amount that was added to the continency line item to offset the reduction in the paid developer fee. . . .

Please keep in mind that that [sic] the construction interest line item was increased in the week prior to closing as a requirement of the lender from the $1,360,000 in your original projections up to $1,765,605 in the closing projections of May 17. I believe this is what is causing the shortfall that you are seeing.

*Id.* Mr. Feaster sent several more emails to NEF employees trying to figure out why the contingency budget was short. He concluded "[i]t does appear that the construction numbers didn't get updated with Neighbors Construction final contract numbers that were sent and therefore our contingency did get netted out of the construction contract rather than be 'in addition to' as we had always discussed. In the exchange back and forth with costs getting spread in different formats from you all to AMFREG and the various last minute adjustments that were made, it wasn't discovered." Dkt. No. 56, Ex. 8. On July 8, 2009, Mr. Feaster sent an email in which he explained his opinion of what happened to the continency budget:

What is not being accounted for is that Scott moved $642,400 which was the part of the land purchase contract that represented existing site work being purchased down into the site work numbers reflected in the construction items in NEF's budget. If you take that out and carry it as a separate line item as we did on our budget, the NEF number, including contingency, becomes $16,470,040. The actual construction number was $16,611,465, I had told Scott that I had the builders risk and permits covered in line items in soft costs for $200,000 so the construction number to use should be $16,411,465 plus the $430,465 in contingency that was not part of our

> contract with NCCI. So essentially the $430,465 contingency was netted out. Giving
> us $16,470,000, when we thought we had $16,841,930 plus the $200,000 in soft
> costs. I know this is confusing, I will put in on a spread sheet and send it. Thanks,
> Mark

Dkt. No. 56, Ex. 11.

The original budget provided for a construction budget of $16,411,465, and a contingency budget of $430,486, for a total of $16,841,951.


*H. The Demand Letter*

On July 23, 2010, NAHF sent Soldier Creek a letter demanding that Soldier Creek repurchase NAHF's interest in the Woodland Park Project.[4] The letter was addressed to Soldier Creek and copies were sent to Hersh Development, and the individual defendants. Soldier Creek has refused to repurchase WIM's interest in the Woodland Park Project. Hersh Development and the individual guarantors have not satisfied Soldier Creek's repurchase obligation.


*I. The Arbitration Award*

---

[4]The letter provided:

The purpose of this letter is to convey the Investor Member's demand that its interest in the Company be repurchased by the Managing Member. And further, to serve notice upon the Guarantors, as that term is defined within the Operating Agreement, that pursuant to that certain guaranty agreement by and among the Guarantors, the Managing Member, and the Company, dated May 1, 2007 (the "Guaranty Agreement") should the Managing Member and the Company fail or otherwise refuse to act in accordance with the terms of the Operating Agreement, the Investor Member will enforce its rights under Article 12 of the Guaranty Agreement against the Guarantors.

Please wire the funds to the Investor Member in accordance with the attached wire transfer instructions listed on Exhibit A. Should the Managing Member fail or otherwise refuse to perform in accordance with Section 6.9 of the Operating Agreement within ten (10) business days of the date of this letter, and should the Guarantors not satisfy fully the obligations of the Managing Member and the Company fail or otherwise refuse to act in accordance with the terms of the Operating Agreement, the Investor Member will enforce its rights under Article 12 of the Guaranty Agreement against the Guarantors.

Dkt. No. 52, Ex. A-4, pgs. 1-2.

On June 11, 2010, Wyatt Hoch issued an Arbitration Award in the dispute between Neighbors Construction and Soldier Creek. Mr. Hoch found that as of January 13, 2009, all apartment buildings in the Project were substantially complete. He also found that "[t]he evidence establishes a $431,000 contingency fund was eliminated from the Project budget before the start of construction, and that Woodland Park experienced at least $357,000 in construction cost overruns before completion." Dkt. No. 56, Ex. 21, pg. 3. Mr. Hoch entered an award of $1,277,770.31 against the Woodland Park Project (WIM and Soldier Creek).

Neighbors Construction also filed suit in Kansas District Court. In that case, Judge Hendricks confirmed the arbitration award in favor of Neighbors Construction on the Woodland Park Project. Neighbors Construction asserted that there had been work performed that it had not been paid for, and WIM argued that Neighbors Construction must finish the Project before getting paid the remainder. WIM is currently appealing the decision.

## II. Legal Standard: Summary Judgment

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact." *Id.* Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hosp.*, 854 F.2d 365,

367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Nat. Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove [nonmovant's] claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987) (alterations added).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Id.* at 250-51. Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in *Matsushita*).

Finally, the court reminds the parties that summary judgment is not a "disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). It is an important procedural vehicle "designed to secure the just, speedy and inexpensive determination of every action." *Id.* One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Id.*

19

### III. Conclusions of Law: WIM's Claims Against the Defendants

*A. Count I: Breach of § 6.9 of the Operating Agreement*

WIM seeks summary judgment on its breach of contract claim against Soldier Creek. WIM claims that Soldier Creek breached § 6.9(e) of the Operating Agreement by failing to repurchase WIM's interest in the Woodland Park Project. The parties have stipulated that Kansas law governs this dispute, and the Operating Agreement contains a Kansas choice-of-law provision.

"The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction." *Carrothers Constr. Co. v. City of South Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231, 239 (2009). "Unambiguous contracts are enforced according to their plain, general, and common meaning in order to ensure the intentions of the parties are enforced." *Vanum Constr. Co. v. Magnum Block, L.L.C.*, 45 Kan. App.2d 54, 59, 245 P.3d 1069, 1073 (2010) (quoting *Johnson County Bank v. Ross*, 28 Kan. App.2d 8, 10, 13 P.3d 351, 353 (2000)). Reasonable contract interpretations are favored under the law. *Id.* "'[T]he law presumes that the parties understood their contract and that they had the intention which its terms import.'" *Iron Mound, L.L.C. v. Nueterra Healthcare Mgmt., L.L.C.*, 44 Kan. App.2d 104, 113, 234 P.3d 39, 45 (2010) (quoting *Tri–State Hotel Co., Inc. v. Sphinx Inv. Co., Inc.*, 212 Kan. 234, 246, 510 P.2d 1223, 1233 (1973)).

To prove a breach of the Operating Agreement, WIM must show: "(1) The existence of a contract between the parties []; (2) Sufficient consideration to support the contract []; (3) Plaintiff's performance or willingness to perform in substantial compliance with the contract; (4) The Defendants' material breach of the contract; and (5) Damages to Plaintiff caused by the breach."

20

PRETRIAL ORDER, Dkt. No. 50, at 8; *see also* KANSAS PATTERN INSTRUCTIONS 4th § 124.01-A; *Alemena State Bank v. Enfield*, 24 Kan. App.2d 834, 954 P.2d 724 (1998). The parties have stipulated that the first two elements are met.

WIM must show that it substantially performed its obligations under the Operating Agreement. Kansas applies the substantial performance rule in contract disputes. *Howarth v. Olivier*, 30 Kan. App.2d 961, 964, 52 P.3d 911, 914 (2002). Under this rule, substantial performance is shown when "'(1) the party made an honest endeavor in good faith to perform its part of the contract; (2) the results of the endeavor are beneficial to the other party; and (3) such benefits are retained by the other party.'" *Id.* (quoting *Almena State Bank v. Enfield*, 24 Kan. App.2d at 838, 954 P.2d at 727). WIM cites to § 3.2 of the Operating Agreement, which defined its obligation to provide capital to the Woodland Park Project. Under § 3.2, WIM was required to provide "Non-Developer Fee Equity" and "Developer Fee Equity" capital contributions after Soldier Creek met certain conditions. It is undisputed that WIM paid the first three Non-Developer Fee Equity and the first Developer Fee Equity installments in accordance with the Operating Agreement. It is also undisputed that Soldier Creek met the conditions necessary for those installments. WIM never released the funds for the Fourth Installment, contending that Soldier Creek did not meet the conditions required for release of the Fourth Installment.

WIM contends Soldier Creek breached § 6.9(e) of the Operating Agreement, which required Soldier Creek to repurchase WIM's interest in the Woodland Park Project under certain circumstances including: "Breakeven Operations does not occur within 12 months of [February 1, 2009], unless [Soldier Creek] provides all funds required, over and above the funds available in the Lease-up Expense Line Item, for all Operating Deficits until Breakeven Operations occurs," or if

"proceedings have been commenced, filed or initiated to foreclose on the Construction Loan or Permanent Loan mortgage or permanently enjoin construction or rehabilitation of the Project." Breakeven Operations did not occur by March 1, 2010, and Wells Fargo Bank initiated foreclosure proceedings on the Construction Loan on June 7, 2010. It is also undisputed that WIM demanded on June 23, 2010, that Soldier Creek purchase WIM's interest in the Woodland Park Project within ten days. Soldier Creek refused, and WIM brought this action five months later.

Soldier Creek does not dispute that the Woodland Park Project failed to achieve Breakeven Operations by the required date or that it did not repurchase WIM's interest. Rather, Soldier Creek argues that WIM waived the conditions on the Fourth Installment. And Soldier Creek argues that WIM's prior material breach of the contract by failing to fully fund the contingency line item excused its subsequent failure to repurchase.

### 1. Waiver

First, Soldier Creek contends that WIM impliedly waived the conditions precedent to the Fourth Installment. Under § 3.2(a) of the Operating Agreement, Soldier Creek was required, among other things: (1) to submit to WIM an architect's certification indicating all the work was substantially completed, (2) to give WIM final lien waivers from Neighbors Construction, and (3) to satisfactorily complete 100% of the project.

"In general, '[w]aiver is an intentional relinquishment of a known right and intention may be inferred from conduct.'" *Found. Prop. Invs., L.L.C. v. CTP, L.L.C.*, 286 Kan. 597, 609, 186 P.3d 766, 774 (2008) (quoting *Postal Sav. & Loan Ass'n v. Freel*, 10 Kan. App.2d 286, 287 698 P.2d 382, 384 (1984)). "'The intent to waive known rights is essential.'" *Stratman v. Stratman*, 6 Kan. App.2d

403, 410-11, 628 P.2d 1080 (1981) (quoting *Prather v. Colo. Oil & Gas Corp.*, 218 Kan. 111, 117, 542 P.2d 297, 303 (1975)). "'It is a general rule that mere indulgence or silence cannot be construed as a waiver.'" *St. Francis Reg'l Med. Ctr., Inc. v. Critical Care, Inc.*, 997 F. Supp. 1413, 1438 (1997) (quoting *Long v. Clark*, 90 Kan. 535, 135 P. 673, 673 (1913)). But justified and reasonable reliance upon an implied waiver will excuse the nonfulfillment of a condition. *Falkner v. Colony Woods Homes Ass'n*, 40 Kan. App.2d 349, 360, 198 P.3d 152, 159 (2008).

Defendants only cite one case from the District of Utah in support of their implied-waiver argument. *See Lone Mountain Prod. Co. v. Nat. Gas Pipeline Co. of Am.*, 710 F. Supp. 305 (D. Utah 1989). Defendants cite two sentences in that case: "The principles of waiver and estoppel support the notion that one party to a contract may not lull the other into a false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance" and "[i]n a contractual setting, waiver occurs when an obligor manifests an intent not to require an obligee to strictly comply with a contractual duty." *Id.* at 311. Defendants contend WIM "lulled" them into believing strict compliance with the Operating Agreement was not required by entertaining the idea of a partial payment.

In January and February 2009, Soldier Creek began requesting a partial release of the Fourth Installment. In response, WIM, through its Associate Asset Manager Mr. Boelter, began discussing a possible partial release with Hersh Development employee Mr. Feaster. Mr. Boelter asked for additional information about the Woodland Park Project and submitted defendants' request for partial release of the Fourth Installment. He also requested permission within the company to defer the conditions noted above. On February 18, WIM's Asset Management Department indicated it did not object to a partial payment of $200,000. None of these actions indicate WIM's "intent" to waive

the conditions or that WIM lulled defendants into a belief that strict compliance with the Operating Agreement was not required. Rather, the emails cited by defendants show that WIM listened to defendants' request for a partial release and discussed within its own corporate structure whether to release a partial payment of the Fourth Installment prior to defendants meeting the required conditions. Ultimately, WIM insisted that defendants meet the necessary conditions for the funding. That WIM "indulged" defendants' request for partial payment does not indicate WIM's intent to waive the conditions precedent to funding the Fourth Installment.

Defendants also contend that WIM expressly waived the conditions, pointing to communications between the parties starting in June 2009. First, on June 26, Ms. Eaton sent Mr. Feaster an email telling him that it looks like WIM would be able to provide the Fourth Installment payment but that it "has to be run through the higher ups" first. Dkt. No. 56, Ex. 10. About a month later she sent George Hersh, II an email stating that WIM "would release the $466,000 into escrow. Please send wiring instructions as soon as possible." Dkt. No. 56, Ex. 11. Then on August 18, she sent a letter to Wells Fargo stating that WIM would release the Fourth Installment on the following conditions:

> 1. Instructions to be sent to Trustee via e-mail by NEF, Rose H. Eaton
> 2. Funds to be received by Wells Fargo Bank, N.A., Trustee, and placed into the construction funding account; and
> 3. Funds shall be released upon receipt of confirmation from the Title company that all outstanding subcontractor liens have been released; and
> 4. NEF's approval to release of the funds.

Dkt. No. 56, Ex. 19.[5]

WIM argues the emails and letter are insufficient to establish a waiver or modification of the

---

[5]Defendants also produced an unsigned letter from Ms. Eaton to Wells Fargo dated July 27, 2009, providing that WIM had agreed to a release of the Fourth Installment. But defendants produced no evidence that this letter was actually sent to Wells Fargo. Thus, this court will only discuss the signed August 18, letter.

conditions in § 3.2 because neither the email nor the letter complied with § 12.11 of the Operating Agreement. Section 12.11 provides the requirements for modification or amendment of the Operating Agreement, "[e]xcept as otherwise provided for herein, this Operating Agreement may not be amended in whole or in part except by a written instrument signed by [Soldier Creek] and [WIM]." "Except for construction contracts, Kansas courts enforce contract provisions that require amendments to be in writing." *Boston Hannah Intern., L.L.C. v. Am. Academy of Family Physicians*, No. 10-2510, 2012 WL 137870, at *4 (D. Kan. Jan. 18, 2012) (citing *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1159 (10th Cir. 2007)); *see also Fitzmorris v. Shaffer*, 2008 WL 4291642, at *4 (Kan Ct. App. 2008) ("[W]e find no authority outside the context of a construction contract that renders ineffective the clear expression of the parties that amendments to their written contract must also be in writing and signed by the parties."). The Operating Agreement is not a construction contract, thus, this court must enforce § 12.11. The email and letter are insufficient to constitute an amendment of the Operating Agreement. Accordingly, defendants' express waiver or modification argument fails.

Regardless of whether WIM impliedly or expressly waived the conditions precedent to the funding of the Fourth Installment, "consideration is a requirement for both oral modifications to the contract and waiver." *Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 702 F. Supp.2d 1304, 1330 (D. Kan. 2010). The consideration must be separate and independent from the original consideration supporting the contract. *See, e.g.*, *Augusta Medical Complex, Inc. v. Blue Cross*, 227 Kan. 469, 474, 608 P.2d 890, 894 (1980); *Bank of America, N.A. v. Narula*, 46 Kan. App.2d 142, 154-57, 261 P.3d 898, 908-09 (2011). Here, defendants do not claim that they provided separate and independent consideration beyond what they were obligated to provide under the original terms of

25

the Operating Agreement. Upon inspection, the court cannot tease out any additional consideration. Thus, even if WIM had waived the conditions in § 3.2, defendants have failed to show they gave separate and independent consideration for such a waiver or modification. Accordingly, defendants argument fails on this ground alone. More importantly, even assuming the parties properly modified the Operating Agreement with sufficient additional consideration, the defendants failed to meet the conditions in the August 18, 2009, letter—defendants presented no evidence from the title company that all subcontractor liens had been released.

Defendants make a last-ditch effort to excuse their nonperformance by arguing that they substantially performed their obligations under the Operating Agreement for funding of the Fourth Installment.[6] First, this argument fails because the defendants have not presented evidence that they provided an architect's certification indicating that "all the work has been substantially completed." Dkt. No. 52, Ex. B. § 3.2(a)(iv)(B). JRMA Architects, Inc., issued nine Certificates of Substantial Completion for nine separate buildings indicating that each was substantially complete. But the architect never certified that "all" of the work was substantially completed. More importantly, it is undisputed that the work was not 100% completed as required under § 3.2(a)(iv)(I). Carports needed to be built, a punch list of miscellaneous work remained unfinished, and some corrective work remained undone. For at least these two reasons, defendants' substantial-completion argument fails.

### 2. Disproportionate Forfeiture Doctrine

Defendants also attempt to excuse the nonperformance of the conditions necessary for the

---

[6]It is important to note that defendants are not arguing they substantially performed their obligations to repurchase WIM's interest or their obligations under the Guaranty Agreement, which would be a defense to a claim that they materially breached those obligations. Rather, defendants argue that they substantially completed the conditions necessary to receive funding under the Fourth Installment.

Fourth Installment under the disproportionate forfeiture doctrine. Under the doctrine, "[t]o the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." RESTATEMENT (SECOND) OF CONTRACTS § 229. Comment b provides:

> The rule stated in the present Section is, of necessity, a flexible one, and its application is within the sound discretion of the court. Here, as in § 227(1), "forfeiture" is used to refer to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance on the expectation of that exchange. See Comment *b* to § 227. The extent of the forfeiture in any particular case will depend on the extent of that denial of compensation. In determining whether the forfeiture is "disproportionate," a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture.

*Id.* Although this court could not find a Kansas Supreme Court case explicitly adopting this section of the Restatement, this District has indicated that "Kansas law agrees with the basic principle set forth in the Restatement." *Zahn Assocs., Inc. v. dot Drug Stores, Inc.*, No. 92-1412, 1993 WL 302251, at *7 (D. Kan. July 19, 1993); *see also Cessna Aircraft Co. v. Aviation, Inc.*, 243 F.2d 815, 819 (10th Cir. 1957). And Kansas has recognized that equity abhors forfeitures, when injustice would result. *See Thurner v. Kaufman*, 237 Kan. 184, 189, 699 P.2d 435, 439 (1985).

Here, defendants are attempting to use the disproportionate forfeiture doctrine to excuse their breaches of the Operating Agreement. And although the disproportionate forfeiture doctrine may be appropriate in some instances, Kansas law overwhelming mandates that when parties to a contract bind themselves to perform certain conditions or lose their rights under the contract, the provisions of the contract must be enforced. *See Zahn Assocs., Inc.*, 1993 WL 302251, at *7. Defendants did not fulfill their obligations under the Operating Agreement. Defendants failed to meet certain

27

conditions under the Operating Agreement prior to WIM's obligation to fund the Fourth Installment—architect's certification, 100% completion certificate, and lien waivers. Defendants also failed to repurchase WIM's interest in the Woodland Park project. Accordingly, it would be improper to use the disproportionate forfeiture doctrine in this instance. *See, e.g.*, *Zahn Assocs., Inc.*, 1993 WL 302251, at *7; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 229, illustrations.

### 3. Mitigation

WIM also seeks summary judgment on defendants' mitigation defense. Defendants argue WIM should have mitigated the damages by funding the Construction Contingency and by funding the Fourth Installment. Because, as noted above, defendants cannot show WIM had an obligation to fund the Fourth Installment before defendants met the required conditions, WIM had no duty to mitigate its damages. *Homes Life Ins. Co. v. Clay*, 13 Kan. App.2d 435, 445-46, 773 P.2d 666, 674 (1989) ("The doctrine of mitigation is not without limitation. Not only is the injured party not required to endure expenses or humiliating or unduly burdensome activities, a party is not required to enter into a contract with one who has breached the original agreement even though terms are offered which would result in avoiding the loss.").[7]

### B. Count II: Breach of Guaranty Agreement

Next, WIM seeks summary judgment on Count II, arguing that Soldier Creek, Hersh Development, and the individual defendants breached the Guaranty Agreement by failing to repurchase WIM's interest in the Woodland Park Project. To succeed on this claim, WIM must

---

[7]Additionally, WIM had no duty to mitigate its damages because "the concept of mitigation of damages doesn't apply to liquidated damages." *State v. Dahmer*, 2009 WL 2242422, at *4 (Kan. Ct. App. 2009).

prove (1) the existence of the Guaranty Agreement, (2) sufficient consideration supporting the Guaranty Agreement, (3) WIM's performance of its obligations under the agreement, (4) defendants' material breach of the agreement, and (5) damages. *See Alemena State Bank*, 24 Kan. App.2d 834, 954 P.2d 724. The first two elements are not at issue. WIM and defendants entered into the Operating Agreement listing Soldier Creek, Hersh Development, and George M. Hersh, II, Brian C. Hersh, and John M. Hersh as guarantors. And there was sufficient consideration. *See Ryco Packaging Corp. of Kan. v. Chapelle Intern. Ltd.*, 23 Kan. App.2d 30, 38, 926 P.2d 669, 675 (1996) (stating that the consideration for the underlying contract can be sufficient for the guaranty).

WIM has also showed that it performed its obligations under the Guaranty Agreement. Under paragraph 4, WIM was required to give Soldier Creek and the "Guarantor"[8] a reasonable period of at least 10 days notice with an opportunity to cure any failure to perform. WIM provided the notice on July 23, 2010, to both Soldier Creek and the Guarantor. And WIM did not file this action until January 10, 2011—nearly six months later.

WIM has also shown that defendants materially breached the Guaranty Agreement. Under the agreement, the Guarantors were required to guaranty Soldier Creek's obligations and to reimburse WIM for expenses incurred in an enforcement action on the Guaranty Agreement. As explained above, Soldier Creek breached its repurchase obligation, and the Guarantors have not satisfied this obligation.

### C. Damages on Counts I and II

As to Count I, WIM has presented evidence that it paid $5,381,940 to date on the Woodland

---

[8]The term "Guarantor" includes Hersh Development, George M. Hersh, II, Brian C. Hersh, and John M. Hersh.

Park Project. Under § 6.9(e) Soldier Creek is required to pay "an amount equal to the sum of all Capital Contributions actually made to [the Woodland Park Project] by [WIM] plus $50,000 plus all expenses incurred by [WIM] in connection with entering into [the Woodland Park Project]." WIM has also been damaged in this amount by the Guarantors' breach of the Guaranty Agreement, which allows for damages resulting from Soldier Creek's noncompliance with the Operating Agreement. But the Guaranty Agreement also permits recovery for "any and all expenses (including without limitation attorneys' fees)." Dkt. No. 52, Ex. 1A, ¶4. Thus, the amount of total damages as to Count II remains as an issue in this case.

## IV. Conclusions of Law: Defendants' Counterclaims

### A. *Hersh Development's Standing*

As an initial matter, WIM contends Hersh Development has no standing to sue for breach of the Operating Agreement, because it was not a party to the contract. "[N]o claim can be sued upon contractually unless it is a contract between the parties to the suit." *Wunschel v. Transcontinental Ins. Co.*, 17 Kan. App.2d 457, 465, 839 P.2d 64, 69 (1992). Generally only a party to a contract, one in privity with a party, a third-party beneficiary, or an assignee may sue on a contract. *Tri-State Truck Ins., Ltd. v. First Nat'l Bank of Wamego*, No. 09-4158 2011 WL 3349153, at *11 (D. Kan. Aug. 3, 2011).

The Operating Agreement states the following: "This . . . Operating Agreement . . . is entered into as of [May 1, 2007] between Soldier Creek, L.L.C., a Kansas limited liability company, as the Managing Member, and NEF Assignment Corporation, as nominee, as the Investor Member." Dkt. No. 52, Ex. B., pg. 1. Hersh Development contends it has standing to sue because the Commitment

Letter states that it "sets forth the entire agreement between [Hersh Development] and NEF and NEFAC and supercedes all previous statements." Dkt. No. 56, Ex. 6., pg. 1. The Commitment Letter also states that its terms and those of the Operating Agreement constitute the "whole of our agreement" unless the terms in the Commitment Letter differ from those of the Operating Agreement. Further, the Commitment Letter identifies Hersh Development as the "Sponsor" and Hersh Development and the individual defendants as the "Guarantors." George Hersh, Brian Hersh, and John Hersh signed the Commitment Letter under the heading "Hersh Development Company." Accordingly, this court finds that Hersh Development is an additional party to the Operating Agreement with standing to sue.

### B. Counterclaim I: Breach of § 7.2 by Participating in the Operation, Management, and Control of the Woodland Park Project

Soldier Creek and Hersh Development contend WIM or its predecessors breached § 7.2 by participating in the operation, management, control, and decision-making process of Soldier Creek. Section 7.2 provides: "Except as otherwise expressly provided in this Operating Agreement, the Investor Member shall not participate in the operation, management, or control of [the Woodland Park Project's] business, transact any business in [] name, or have any power to sign documents for or otherwise bind [the Woodland Park Project]." The Operating Agreement does not define "operation, management, or control." Soldier Creek identifies four specific instances of alleged improper influence: (1) Ms. Eaton told the defendants that they were required to hire Sales, Inc., to get the property leased-up; (2) Ms. Eaton told defendants to require the general contractor to repair all deficiencies identified by the architect; (3) Ms. Eaton told defendants what rent to charge, and told them to reduce rent; and (4) Ms. Eaton and Mr. Boelter told the management company's staff

31

how to perform their jobs.

WIM admits that some of its instructions to Soldier Creek about how best to lease-up the property may have been unauthorized by the Operating Agreement. WIM told Neighbors Construction to finish all deficiencies before getting paid. WIM also suggested that Soldier Creek reduce rents on the two-bedroom apartments, implement a commission sales program for the sales staff, and provide information on the number of applications received and units leased. And George Hersh testified that Ms. Eaton and Mr. Boelter instructed the management company's staff to process claims faster, set up a model apartment, put on a barbeque, and have promotions to give away a TV and free rent for a year. Such actions constitute participation in the "operation, management, or control" of the Woodland Park Project.

WIM contends that § 6.2 impliedly allowed it to participate in this type of problem solving. Section 6.2 contains a list of several activities that require WIM's "prior written consent" before the defendants can act. *See supra* Section I.D. After a careful reading of § 6.2, it is clear that it prohibits Soldier Creek from taking certain actions without WIM's consent; it does not impliedly permit WIM to take actions to correct what it perceives as Soldier Creek's breaches of § 7.2. Although it is unclear exactly what the ban on participating in the operation, management, or control means, the uncontroverted facts support Soldier Creek's claim that WIM improperly participated in the operation, control, management, and decision making of the Woodland Park Project. Yet Soldier Creek has failed to offer any evidence that WIM's actions caused it any damage, and for this reason the claim fails. First, Soldier Creek has admitted that none of the actions taken by WIM caused it to breach any agreements it had with third parties. And defendants only vaguely link their damages to WIM's alleged breach of § 7.2. In their Response, defendants stated "[h]ad [WIM] fully funded

32

the contingency budget, or paid the Fourth Installment, or even just let the Defendants manage Woodland Park without interference, it is possible that the Project could have been completed." Dkt. No. 56, pg. 45. This bald claim of injury cannot survive summary judgment. Accordingly, the court grants WIM summary judgment on Counterclaim I.

### C. Counterclaim II: Failure to Fund the Fourth Installment

In Counterclaim II, defendants contend WIM is liable for breach of contract for failing to fund the Fourth Installment. As noted above, WIM met its funding obligations under the Operating Agreement and defendants failed to meet the conditions necessary for receiving the Fourth Installment. *See supra* Section III.C. Therefore, WIM did not breach the Operating Agreement by not funding the Fourth Installment, and WIM is entitled to summary judgment on this Counterclaim.

### D. Counterclaim III: Tortious Interference with Existing Contracts

In Counterclaim III, defendants argue WIM tortiously interfered with the Operating Agreement by (1) exercising improper pressure, influence, and interference with the operation, management, control, and decision-making process of the Woodland Park Project (breach of § 7.2); and (2) failing to fulfill its obligation to fund a "Construction Contingency" budget. The court has discussed defendants' § 7.2 arguments above, and because defendants failed to allege any facts concerning damages regarding WIM's potential breach of § 7.2, defendants' tortious interference claim on this ground fails.

To prevail on a tortious interference with an existing contract claim, defendants must show: (1) the existence of a contract; (2) WIM's knowledge thereof; (3) WIM's intentional bringing about

33

of its breach; (4) the absence of justification; (5) damages; and (6) malicious conduct by WIM. *See* KANSAS PATTERN JURY INSTRUCTIONS § 124.91 (2011); *see also Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 168-69, 872 P.2d 252, 257 (1994). It is unnecessary to analyze each element of the claim because it is clear that defendants have not produced any evidence that WIM acted with malice. Malice is "the intent to do harm without any reasonable justification or excuse." KANSAS PATTERN JURY INSTRUCTIONS § 103.05 (2011). In an attempt to show malice, defendants cite a February 6, 2009, email Mr. Boelter sent to Mr. Fitzpatrick stating "[h]ere is the latest budget. There's some budget left, but the contingency is not accurate. They have used $240k out of the $430k of contingency which leads me to believe what else isn't accurate." Dkt. No. 56, Ex. 3. Defendants contend this email shows that WIM did not have the accurate Construction Contingency and that WIM knew the contingency was inaccurate. WIM argues the email merely expresses WIM's concerns about whether defendants' accounting of the Construction Contingency was accurate. At best, the meaning of the email is ambiguous. It is possible that it shows WIM's knowledge that the Construction Contingency was inaccurate or that defendants' accounting was incorrect. Regardless, it is clear the email falls far short of showing malice. For this reason alone the tortious interference claim fails.

Even if the claim did not fail on the merits, WIM contends the claim must fail because defendants cannot show that WIM was required under the Operating Agreement to fund the Construction Contingency budget. No provision in the Operating Agreement or the Commitment Letter explicitly requires WIM to fund a Construction Contingency, and both constitute the "whole" agreement of the parties. Dkt. No. 56, Ex. 6, pg. 1. The only reference to a Construction Continency is in the Financial Projections attached to the Operating Agreement as Appendix I. These Projections

34

indicate a Construction Contingency of 4.6%. The Operating Agreement, however, outlines in detail WIM's funding obligations. Under § 3.2, WIM was required to provide total capital contribution of $7,057,000 to the Woodland Park Project in separate installments—five Non-Developer Fee Equity installments and three Developer Fee Equity installments. WIM paid in accordance with § 3.2 until defendants breached the agreement by failing to meet the conditions necessary for receiving the Fourth Non-Developer Fee Equity installment. *See supra* Section III.C. And § 3.8 provides that "[e]xcept as expressly provided in this Operating Agreement, no Member is required to make additional contributions to the capital of [the Woodland Park Project]." Dkt. No. 52, Ex. B. Defendants have failed to create a genuine issue of material fact on the issue of whether WIM was required to fund a Construction Contingency outside of its funding requirements stated in § 3.2. Therefore, defendants' tortious interference claim also fails because defendants have not identified any "interference" with the Operating Agreement.

### E. Breach of Duty of Good Faith and Fair Dealing

Defendants allege in Counterclaim IV that WIM's failure to fund a Construction Contingency breached the implied covenant of good faith and fair dealing. Kansas law implies a duty of good faith in every contract. *Law v. Law Co. Bldg. Assocs.*, 42 Kan. App.2d 278, 285, 210 P.3d 676, 682 (2009). The duty includes "'not intentionally and purposely do[ing] anything to prevent the other party from carrying out his part of the agreement, or do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contact.'" *Narula*, 46 Kan. App.2d at 170, 261 P.3d at 917 (quoting *Bonanza, Inc. v. McLean*, 242

Kan. 209, 222, 747 P.2d 792 (1987) (alterations added)). "[I]n order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, plaintiffs must (1) plead a cause of action for 'breach of contract,' not a separate cause of action for 'breach of duty of good faith,' and (2) point to a term in the contract 'which the defendant[ ] allegedly violated by failing to abide by the good faith spirit of that term.'" *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1359 (D. Kan. 1996) (quoting *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1184 (D. Kan. 1990)).

Here, defendants have pled a cause of action for breach of contract. But they have not pointed to any term of the Operating Agreement that WIM violated by failing to abide by the good spirit of that term. As analyzed above, WIM provided funding in accordance with § 3.2, and defendants have not produced any evidence indicating WIM was obligated to separately fund a Construction Contingency of 4.6%. Yet "a party can breach this implied covenant *absent* a specific covenant to which it must apply. In fact, our [Kansas] Supreme Court has noted that Kansas courts will impose an obligation of good faith that would override express contract terms, except in the area of employment-at-will." *Law*, 42 Kan. App.2d at 286, 210 P.3d at 682 (emphasis in original). Nevertheless, defendants have not produced sufficient evidence that WIM breached an independent duty of good faith and fair dealing. Accordingly, Counterclaim IV fails and WIM is entitled to summary judgment.

IT IS ACCORDINGLY ORDERED this 23d day of May 2012, that Woodland Investor Member L.L.C.'s Motion for Summary Judgment (Dkt. No. 51) is granted. WIM is entitled to summary judgment in the amount of $5,381,940.00 against Soldier Creek on Count I. The court also grants WIM summary judgment as to all defendants in Count II for the same amount. Additionally, WIM is entitled to "any and all expenses (including without limitation attorneys' fees)" under the

Guaranty Agreement on Count II. The amount of these expenses and attorneys' fees remains an

issue.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE